THE SAFE DEPOSIT & TRUST COMPANY OF BAL-
TIMORE, Trustee, and CHARLES E. RIEMAN,
Trustee and Committee of Perlee L. Rieman,
and CARLTON ALEXANDER RIEMAN and
CHARLES E. RIEMAN, Executors Named in the
Paper Writing Purporting to be the Last Will
and Testament of Annie Lowe Rieman, Deceased,
*vs.* MARY ISABEL THOM and CHARLOTTE RIE-
MAN McINTOSH.

*Wills: revocation of separate clauses; erasures.*

The last will of a testatrix had remained in her possession
until the time of her death, and was then found among
her papers with certain items partially erased and the
names retraced; with the will there were other memoranda
all sealed in an envelope addressed to her attorney, directing
him what alterations he was to make; and other evidence
showed that she desired a new will to be drawn by him and
that the erasures and memoranda were merely for his in-
formation, it was *held* that the erasures did not effect the
revocation of the will or of the items erased.          p. 166

If a testator erases an item of the will, with the intention that
such erasure should operate as a revocation, he cannot after-
wards re-establish the will by retracing the letters erased.
                                                      p. 166

Under sec. 318 of Art. 93 of the Code, a testator may revoke
a clause of his will without destroying or invalidating the
remaining clauses provided he does not thereby enlarge the
estate of any one or change the character of the remaining
provisions.                                    pp. 161-162

In general where a will was in the custody of the testator and
upon his death is found among his private papers, cancelled
or obliterated, it is presumed that it was so cancelled or

obliterated by the testator and that he did it *animo revocandi*.                                                         p. 162

But if the will was last in the custody of another, it is incumbent upon the party asserting the revocation to show the will again in the testator's custody, or that it was mutilated or destroyed by his direction.                             p. 162

Revocation requires an act sufficient under the provisions of the Code, and an intention to revoke; where the intention is clear slight acts of cancellation or obliteration may be sufficient to constitute revocation; but an intention to revoke can not be presumed from acts that are in themselves incomplete and inconclusive, and that are readily accounted for in some other way.                                        p. 163

*Decided January 9th, 1912.*

Appeal from the Orphans' Court of Baltimore City.

The cause was argued before BOYD, C. J., PEARCE, BURKE, THOMAS, URNER and STOCKBRIDGE, JJ.

*W. Calvin Chesnut* and *Edgar H. Gans* (with a brief by *Gans and Haman*), for the appellant.

*D. G. McIntosh* and *Bernard Carter*, for the appellee.

THOMAS, J., delivered the opinion of the Court.

On the fifth of July, 1911, Charles E. Rieman of Baltimore County, Maryland, filed in the Orphans' Court of said county a petition in which he stated that his mother, Annie Lowe Rieman, of said county, died on the third of March, 1911, leaving as her only heirs at law and next of kin two daughters, namely, Mary Isabel Thom, of Baltimore City, and Charlotte Rieman McIntosh, of Baltimore County, and three sons, Carlton Alexander Rieman, of Baltimore County, the petitioner and Perlee L. Rieman, who has been adjudicated *non compos* and whose trustee and committee is the petitioner. The petition further averred that the petitioner

and his two sisters and his said brother, Carlton Alexander
Rieman, some days after the death of his mother made dili-
gent search among her papers for the purpose of ascertain-
ing whether she left a will, and that they found the will here-
inafter referred to among her private papers; that upon
examination of the same in the presence of his said brother
and sisters and George R. Willis, Esq., an attorney at law
of Baltimore City, he discovered that "the face of the paper
contained evidence of the erasure, or attempted erasure of
the first item of the will;" that subsequently Mr. Willis
informed the petitioner and his said brother and sisters that
the deceased had told him that she had erased the "First
Item," and had given him her reasons for so doing. The
petition then stated that said will when found was in a sealed
envelope in which was also enclosed a letter addressed by
the deceased to Mr. Willis; that the will and letter had been
in the possession of the petitioner ever since the envelope con-
taining them had been found, and were "in the same condi-
tion in which they were when so found," and that he pre-
sented them, with said petition, to the Court for such action
as might be proper to be taken in connection with the probate
of said will or instrument of writing.

By agreement of counsel representing all persons inter-
ested in the estate and The Safe Deposit & Trust Company
of Baltimore, appointed trustee by said will, said trustee,
after notice to the heirs of law and next of kin of the deceased,
on the thirteenth of July, 1911, presented and propounded
the will for probate in said Orphans' Court, and thereupon
Mrs. Thom and Mrs. McIntosh filed in said Court their peti-
tion charging that the deceased had erased the first item of
the will; that her said act operated as a cancellation and
revocation of said item and of the whole will, and that she
intended that it should so operate, and praying that said
will be by said Court declared cancelled and revoked, and
that said trustee, the said Charles E. Rieman, trustee and
committee for Perlee Lowe Rieman, and Carlton Alexander
Rieman and Charles E. Rieman, named as executors of the

will, be required to answer, etc.  This petition was answered
by The Safe Deposit and Trust Company, trustee, denying
that the will or any part of it had been revoked.  The answer
of Charles E. Rieman and Carlton Alexander Rieman, execu-
tors, states that they do not admit that the deceased
"attempted to erase, believed she had erased and did erase
the first item in said" will, or that her act in connection "with
the alleged erasure of said first item, operated as a cancella-
tion and revocation of said first item, and of said" will, and
that they require proof thereof by the petitioner, while the
answer of Charles E. Rieman, trustee and committee,
"neither admits nor denies" the alleged revocation of the
will.  A replication was filed by the petitioners, evidence
was produced before the Orphans' Court, and, by agreement
of counsel, was subsequently written by the stenographer and
filed in the case.  On the 18th of July, 1911, the Orphans'
Court passed an order adjudging that the will had been can-
celled and revoked by the deceased, and that probate of the
same be refused, and, on the same day, passed a further order
granting letters of administration on the estate of the deceased
to Charles E. Rieman and Carlton Alexander Rieman.  It
is from these orders that The Safe Deposit & Trust Company,
trustee, has appealed.

In order to arrive at the real intention of the deceased,
and to determine the effect to be given to the alleged act of
revocation, it will be necessary to keep in view the provisions
of the will in question.  After providing for the payment of
her just debts and funeral expenses, it proceeds:

"Item: I give and bequeath unto each of my children,
that is to say: Mary Isabel Thom, Carlton Alexander Rie-
man, Charles E. Rieman and Charlotte Rieman McIntosh,
the sum of ten thousand dollars ($10,000)."

"Item: I give and bequeath unto the Safe Deposit and
Trust Company of Baltimore, in trust for the use of my son
Perlee Lowe Rieman, the sum of ten thousand dollars
($10,000) to be held by the said trustee for and during the
term of his natural life and subject to the same limitations

hereinafter expressed of that part of the rest and residue
of my estate which I have given unto the said trustee for
the use and benefit of my said son, Perlee Lowe Rieman."

By the third item the deceased gives to Mary Ann Dono-
van, nurse of her deceased daughter, provided she was living
at the death of the deceased, the sum of $250. By the fourth
item she gives to each of certain servants $100, and to cer-
tain other servants each the sum of $25, and by the fifth
item she gives to her two daughters all her wearing apparel,
jewelry, laces, toilet silver, contents of her wardrobe, writ-
ing desks and store rooms. The sixth item is as follows:

"Item: I give, devise and bequeath all of the rest and resi-
due of my estate hereinafter called my 'trust estate' unto the
Safe Deposit and Trust Company of Baltimore, in special
trust and confidence, with the powers and to and for the uses
and purposes following, that is to say: With full power and
authority to invest all moneys which it may receive in perma-
nent or transient investments, ground rents, annuities, stocks,
bonds, mortgages or other good and safe income-producing
securities, as may to it seem most advantageous to those inter-
ested in the rest and residue of my estate, and my said
trustee is further authorized and empowered at all times dur-
ing the continuance of said trust, for the purpose of re-invest-
ment to sell any of the securities or investments so made or
to change any investments left by me or which may be pro-
cured by it and to re-invest the proceeds of any sale or sales
upon the trusts herein declared, and in turn to sell or change
any of the investments thus made by it, submitting, however,
in the administration of this trust all of its acts so to be done
with reference to the management of the trust estate to some
Court of competent jurisdiction for its approval. And my
trustee is further directed to pay unto each of my four chil-
dren: Mary Isabel Thom, Carlton Alexander Rieman,
Charles E. Rieman and Charlotte Rieman McIntosh, in quar-
terly installments, one-fifth (1/5) part of the net income of
the rest and residue of my estate, such payments to be con-
tinued to be made to each of my said four children for and

during the full end and term of his or her natural life, and to pay the other one-fifth (1/5) part of the net income of the said rest and residue of my estate to the committee or trustee of my son Perlee Lowe Rieman, for and during the term of his natural life.

In the event of any one of my five children above named, departing this life, I direct my said trustee to divide my estate into five equal parts, having reference to quantity and values and to transfer, pay and deliver one of said five parts unto the child or children of such deceased child of mine, share and share alike *per stirpes* and not *per capita.* In the event of any of my five children departing this life without issue living at the time of his or her death, then shall a portion of my trust estate so set apart for the use of the child so dying, be by my trustee divided equally among my children, the child or children of any deceased child of mine to take his, her or their parents's share *per stirpes* and not *per capita.* The share of each of my children living at the time of this division, shall be held by my trustee for the use of my children respectively, for life, with the same limitations over, as is herein imposed upon the original shares of my children respectively."

Then follows a suggestion to the trustee in reference to the sale of certain unimproved real estate in Dayton, Ohio; and by the remaining and last item Carlton Alexander Rieman and Charles E. Rieman are appointed executors.

The will is dated March 11th, 1907, and the evidence produced by the Safe Deposit and Trust Company, trustee, shows that it was duly executed by the deceased on that date, and that it remained in the possession of Mr. Willis until the 29th of June, 1909, when, at her request, he mailed it to her address in Baltimore County. It was found after her death in her desk, with some instructions to Mr. Willis, in an envelope which was sealed and addressed to him.

From an inspection of the original will, which was produced at the argument of the case in this Court, it appears that the names of the four children of the deceased in the first item

have been rubbed and that some of the letters making up
these names have been relined or retraced with a lead pencil.
The words "each of my children" in the same item appear
to have been rubbed also, but no part of said item has the
appearance of having been entirely rubbed out, erased or
rendered illegible.

It appears from the evidence produced by the petitioners,
appellees, that on the 20th of April, 1910, Mr. Willis called
to see Mrs. Rieman at her home. in Baltimore City in regard
to some changes she desired to make in her will, and that
she then told him that she desired to divide the whole of her
estate into five equal parts, that "she did not want any dis-
tinction among her children; wanted to have them all alike,"
and that she wanted her two sons, Carlton A. and Charles
E. Rieman, and her two daughters, to have their parts abso-
lutely, but she wanted the share of her son who was *non
compos* to be held in trust for him for life; that she did
not want the shares of her sons, Carlton and Charles, and
her two daughters held in trust, as is provided in the will
in question, and gave as her reason for desiring to make this
change that at the death of Mrs. Thom and Mrs. McIntosh
their children will come into possession of quite large estates
under their grandfather's will, and that she wanted her
daughters to have what she was going to leave them subject
to their control absolutely. Mr. Willis says that Mrs. Rie-
man called at his office on the 25th of April and on the 16th
of June, 1910, when they talked over the proposed changes
in her will, and that on the 28th of June, 1910, she called
again "and gave me instructions to prepare the will giving
these four children I have named their shares absolutely and
the other one-fifth to be in trust for the other son. She
said to me further: There are some specific legacies, money
legacies, I want to give and I will write the names out for
you and the amounts I want to give. I remember, in particu-
lar one was an indebtedness she wanted to release. All right
I said; I was ready to prepare the will just as soon as I got
the information with reference to the legacy. She died

before she sent me the memorandum, and in this envelope which was found after her death in my presence and which was handed to me by her son Charles and by me opened, was this memorandum, addressed to me.

"MR. WILLIS:

My legatees are my cousin, Mrs. Nellie Lowe Johnston, Mrs. Gabriel Johnston, Washington, D. C., the sum of $2,000.00, and the debt of $3,000.00 be forgiven her if it is not paid at my death.

To Lucilla Rieman,

Mary Rieman,

Clara Rieman,

Mildred Rieman,

all daughters of Henry Rieman, of Hawksworth, near Easton, Eastern Shore of Maryland, the sum of $250.00 apiece. To Miss Mary Hutchinson Warfield, 700 N. Howard street, Baltimore, the sum of $500.00. To Mrs. Mary Willoughby Osterhaus, wife of Capt. Hugo Osterhaus, U. S. N., the sum of $500.

ANNIE L. RIEMAN."

Mr. Willis also states: "At the last interview, which was on the 28th of June, she told me, in commenting upon the change that she was going to make, giving the children I have named one-fifth absolutely, that she had rubbed out a provision in her will whereby she had given to each of the children I have named $5,000 absolutely, because, she said, that is no use now because if they are going to get one-fifth of the whole of the estate there is no use of giving them $10,000 absolutely. I told her that she ought not to rub anything out of the will because that was not a proper thing to do, to erase a will or to attempt to change it in that manner."

The Safe Deposit and Trust Company, trustee, objected to this evidence adduced by the petitioners, and filed a motion to strike it out, but the Court below overruled the motion.

Under the provision of section 318 of Article 93 of the Code a will may be revoked "by some other will or codicil in writing, or other writing declaring the same, or by burning,

cancelling, tearing or obliterating the same, by the testator himself or in his presence, and by his direction and consent;" and the right of a testator under this section of the Code to revoke a clause of his will without destroying or invalidating the remaining clauses, provided he does not thereby enlarge the estate of any one who takes under the will, or change the character of the remaining provisions, was distinctly recognized in *Eschbach* v. *Collins,* 61 Md. 478, and affirmed in the case of *Home of the Aged* v. *Bantz,* 107 Md. 543. In the latter case this Court, upon the authorities there cited, also adopts the rule that where a will was in the custody of the testator and upon his death is found among his private papers, cancelled or obliterated, it is presumed that it was so cancelled or obliterated by the testator and that he did it *animo revocandi,* and quotes the statement in *Redfield on Wills,* 307, that, "The rule of evidence in the ecclesiastical Courts in regard to presumptive revocations from the absence or mutilation of the will seems to be that if the will is traced into the testator's possession or custody and is there found mutilated in any of the ways pointed out in the statute for revocation or is not found at all it will be presumed that the testator destroyed or mutilated it *animo revocandi;* but if it was last in the custody of another it is incumbent upon the party asserting the revocation to show the will again in the testator's custody or that it was mutilated or destroyed by his direction."

If, therefore, in the case at bar the first item of the will had been cancelled or obliterated, the will having been in the custody of Mrs. Rieman, and having been found after her death among her private papers, the presumption would have been that it was done by her and that she intended thereby to revoke that clause of her will, unless it could be said, which, however, we must not be understood as saying, that there is such an intimate or interdependent relation between that clause and the other portions of the will as to give rise to the presumption that she intended to revoke the whole will. *Home of the Aged* v. *Bantz, supra.* But, as we have said,

from an inspection of the original will, it appears that parts of the first item were only rubbed and then some of the letters were retraced by lead pencil, and that no part of the clause was entirely obliterated or rendered illegible. We have been unable to find any case in which it was held that a will found in such a condition among the papers of the deceased must be presumed to have been revoked by him. The ground upon which the presumption of revocation rests, where the will was in the custody of a testator and is found cancelled, etc., is that there is no other way to account for its condition. Revocation requires an act, sufficient under the provisions of the Code, and an intention to revoke, and while, where the intention is clear, slight acts of cancellation or obliteration may be sufficient to constitute a revocation, an intention to revoke can not be *presumed* from acts that are in themselves incomplete and inconclusive, and that are as readily accounted for in some other way. In the case of *Eschbach* v. *Collins, supra,* the Court said: "It is not necessary that the words erased should be wholly illegible, but the act of the testator must be such as to clearly indicate an intention to expunge the whole clause, so that it will no longer constitute a sub-division of the will," and this was repeated in *Home of the Aged* v. *Bantz, supra.* These cases furnish an instance of attempted alteration and of a revocation by cancellation where, of course, the parts cancelled need not be entirely erased or rendered illegible, but even in those cases the Court was careful to say that cancellation must be such as to clearly indicate an intention to revoke. Here, as appears from the face of the will, the act itself is incomplete, not in the sense that the clause was not entirely rubbed out or obliterated, but in the sense that that which was begun was not finished and was abandoned. Such an act is clearly too indefinite, too incomplete to form the foundation of a presumption that the testatrix intended thereby to revoke an instrument which she had executed with so much formality. She may have commenced to rub out the first clause of her will with the view of revoking it, and then, before com-

pleting what she intended to do, changed her mind and retraced the letters rubbed, and that is what is suggested by the appearance of the will. In 1 *Jarman on Wills,* 157 (6th ed.), it is said: "But it is clear, that if a testator is arrested in his design of destroying the will, by the remonstrance or interference of a third person, or by his own voluntary change of purpose, and thus leaves unfinished the work of destruction which he had commenced, the will is unrevoked." In the case of *Doe* v. *Perbes,* 3 B. & Ald. 489 (106 Eng. Rep. Full Reprint, 740), the testator, urged by sudden impulse of passion against one of the devisees, undertook to cancel his will by tearing, and after tearing it twice through, was pursuaded by one present, before he completed his purpose, to desist, and he then, after putting the pieces of the will together, said: "It is well it was no worse," it was held that the will remained unrevoked. In the case of *In re Wood's Will,* 11 N. Y. S. 757, 32 N. Y. State Reporter, 286, it appeared that the signature of the testatrix had been erased by drawing diagonal lines over the same, and then the lines and the name were nearly erased, and her name carefully rewritten in her own handwriting with a different colored ink. The Court, in disposing of the case, said: "I am asked by the contestants to presume as a matter of law that the erasure was made *animo revocandi* with intent to revoke and destroy the will and that the act was sufficient to accomplish the intent. If the will had been found in her safe carefully preserved among the valuable papers of the testatrix, with her signature erased, it would have been a fair and reasonable presumption that she erased the signature *animo revocandi,* and it would then be lacking in one of the statutory requirements of a valid will—the signature of the decedent at the end thereof; but when found with the signature carefully restored, no such presumption arises. In the absence of all proof how can I find that it was made with the intent to revoke, when the instrument was preserved by her with her signature carefully restored? An intention to revoke a will not fully consummated is no revocation (*Doe* v. *Perbes,*

3 Barn. & Ald. 489). The cancellation of a will does not necessarily involve its revocation. The cancelling itself is an equivocal act and in order to operate as a revocation must be done *animo revocandi.* (2 *Whart. Ev.,* sec. 900; *Dan* v. *Brown,* 4 Cow. 483, 490.) It may be that Mrs. Wood drew the lines through her name with the intention of revoking the will, but immediately, and before the act was completed, changed her mind, erased the marks and restored her signature. To sustain the theory of the learned counsel for the contestant, I must find that the erasure was made by the testatrix herself, understandingly, freely and voluntarily, with no other purpose than to destroy her will, and that it was done at sometime previous to the act of re-writing her name; and this finding is asked for in the absence of proof and with the burden resting upon the contestants to establish the fact of revocation." We have quoted at some length from the opinion in that case because it shows that the Court was dealing with much the same state of facts as confronts us in this case, when considering the question whether a revocation can be presumed from the condition of the will. It is said in *Schouler on Wills and Administration,* sec. 390: "Where the testator arrests his own design before the act is completed, a revocation does not take place," and in 1 *Redfield on Wills,* star page 307, it is stated that: "Where the testator is arrested in his purpose, and changes his determination to revoke his will, before the act is completed, by which he designed to express his intention," his act does not amount to a revocation. If where the act, by which the testator designed to accomplish a revocation and to evidence his intention to do so, is not completed by him but is abandoned, a revocation is not effected, it would seem to follow that where the condition of the will indicates that the act of obliterating was abandoned before completion, and that the testatrix restored the letters or words partially rubbed out or erased, there can be no presumption that the will was revoked.

For these reasons there is no presumption in this case because of the condition in which the will was found, that Mrs. Rieman intended to revoke either the first item or the whole will, and this brings us to the consideration of the other evidence in the case, which was objected to by the appellant.

. Assuming, without deciding, that all of it was admissible, we do not think it is sufficient to sustain the contention of the appellees. When taken in connection with the will itself, it demonstrates two things, first, that Mrs. Rieman had no idea of dying intestate; and, second, that it was her fixed and settled purpose throughout to make equal provision for her five children, and to so leave the share of her son Perlee that after his death it would go to her other children and their descendants. Therefore an intention to revoke her will or the first item of it, by rubbing parts of that item, would. be inconsistent with her clearly established desire to make the provisions mentioned, unless it was done with the further purpose of accomplishing them by another will. The evidence shows that she was, from the 20th of April until sometime after her last interview with Mr. Willis on the 28th of June, 1910, anxious to make a change in her will, and the appellees rely upon her statement to Mr. Willis that she had rubbed out the provision in her will giving four of her children each $10,000, and the condition of the will, to show that she had prior to that statement obliterated the clause referred to with the intention of destroying the will. Of course, if she rubbed the first item to the extent indicated with the intention that *that slight rubbing* should operate as a revocation, she could not afterwards re-establish the will by retracing the letters rubbed. But the fact that when the will was found after her death in an envelope with additional instructions for a new will the words or letters that had been rubbed were retraced, would indicate that she did not, in the first instance, intend the rubbing to effect a revocation, for if she had deliberately revoked the will, and intended to make a new one, there was no reason why she should retrace what

she had partly erased. If, on the other hand, she did not intend, *by the rubbing of the first item,* to revoke the will, it was but natural, when told by her trusted advisor that it was not the proper thing to do, that she should attempt to rectify it, pending the execution of a new will containing the changes she desired to make, and which she knew would effect a revocation of the old. It is clear that she could not have intended, by the slight rubbing of the *first item,* to revoke the *whole* will, and her settled purpose, apparent from the evidence, to make equal provision for her children, precludes the idea that she intended to revoke the first item, for that, if it could have been accomplished, would have resulted in giving to her son Perlee more than he would otherwise have received, and in an unequal distribution of her estate. The only reasonable conclusion from all the evidence is that having determined to change her will so as to give to her two daughters and her two sons, Carlton A. and Charles E. Rieman, absolute estates in their shares, Mrs. Rieman partly rubbed out or erased the item giving each of them $10,000, not with the intention of *thereby* destroying the will or that clause, but as a means and for the purpose of indicating to her attorney, who was to prepare the new will, that that clause or item was to be left out of the will she was about to make, and that she did not intend that the rubbing should have any significence independent of and apart from the making of a new will. This view is confirmed by her statement to Mr. Willis, as her reason for rubbing out the first item, that if the children referred to "are going to get one-fifth of the whole estate, there is no use giving them $10,000 absolutely."

This conclusion is not at all in conflict with the case of *Semmes* v. *Semmes et al.,* 7 H. & J. 388, where it is stated by Chief Justice Buchanan that if a will is deliberately cancelled, without accident or mistake, it will operate as a revocation, although the party may at the time have intended to make another will, and afterwards failed to do it. The same view is expressed in 1 *Redfield on Wills,* star page 308 (4th ed.), where the author says: "But if a testator destroys

a. will upon the mere general purpose of thereafter making another, it will not hinder the revocation becoming effectual, because he dies without carrying such purpose of making a new will into effect.

. Where, however, what was done was not intended to have any effect apart from and independent of the making of a new instrument, it cannot operate as a revocation of the existing will, for the manifest reason, as distinctly recognized in *Semmes* v. *Semmes, supra,* that unless the act relied on was done *animo revocandi,* it does not amount to a revocation. A similar principle is clearly stated and applied in the case of *McIntyre* v. *McIntyre,* 120 Ga. 71, where the Court says: "The mere fact that the testator intended to make a new will, or made one which failed of effect, will not alone, in every case, prevent a cancellation or obliteration of a will from operating as a revocation. If it is clear that the cancellation and the making of a new will were parts of one scheme, and the revocation of the old will was so related to the making of the new as to be dependent upon it, then if the new will be not made, or if made is invalid, the old will, though cancelled, should be given effect, if its contents can be ascertained in any legal way. But if the old will is once revoked—if the act of revocation is completed,—as if the will be totally destroyed by burning and the like, or if any other act is done which evidences an unmistakable intention to revoke, though the will be not totally destroyed, the fact that the testator intended to make a new will, or made one which can not take effect, counts for nothing." This rule is also stated in 1 *Williams on Ex.* (7th ed.), 200; 1 *Jarman on Wills* (6th ed.), 154, and in 30 *Ency. of Law,* 633 (2nd ed.), where many cases are cited in support of the text. Here all that the evidence shows is that what was done must have been done for the sole purpose of indicating to the attorney of the deceased that the item slightly rubbed was not to be included in the new will, and we are not, therefore, required to go to the extent of the authorities last cited.

We have carefully considered the very able arguments of counsel, and have examined the authorities cited, but are unable to reach the conclusion that Mrs. Rieman intended to destroy the will in question. The case of *Bell* v. *Fothergill,* and others, Vol. 2 Law Reports, Probate Div. 148, cited by the appellees, and which resembles in some respects the case at bar, LORD PENZANCE, speaking of the condition of the will, said: "The signature had been cut clean out, above, below and cross-ways, apparently by a pair of scissors, but the paper so cut out had been placed in its position again, and gummed there." Under such circumstances, the Court held that the will had been revoked. We can not give to the slight rubbing in the case at bar the effect of such a decisive act as that described.

It follows from what has been said that the orders appealed from must be reversed.

> *Orders reversed, with costs, and case remanded.*